IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

RUDOLPH SABLE,

      Plaintiff,

v.

JANUS CAPITAL MANAGEMENT LLC,

      Defendant.

## COMPLAINT

Plaintiff, Rudolph E. Sable, for the use and benefit of the Janus Mid Cap Value Fund,

sues Defendant, Janus Capital Management, L.L.C., and alleges:

## I.  JURISDICTION AND VENUE

1.  This action is a derivative action brought by Plaintiff on behalf of the Janus Mid Cap

Value Fund (the "Fund") pursuant to § 36(b) of the Investment Company Act of 1940 ("ICA"),

as amended, 15 U.S.C. § 80a-35(b).

2.  This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. §

80a-35(b)(5), and 28 U.S.C. § 1331.

3.  Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C.

§ 1391(b)(2)-(3).  Defendant is an inhabitant of or transacts business in this district, a substantial

part of the events or omissions that give rise to Plaintiff's claims occurred in this district, and

Defendant may be found in this district.

4.  All conditions precedent have been performed or have occurred.

## II.  BACKGROUND

5.  Plaintiff is a shareholder in the Fund, which is an open-end registered investment

company, or mutual fund, created, sold, advised, and managed with other funds as part of a fund

family or complex by Defendant (the "Fund Complex" or the "Janus Complex").  Defendant, as

the advisor and control person of the Fund, owes fiduciary and other duties to Plaintiff and all

shareholders of the Fund and all of the funds in the Fund Complex.

6.      Pursuant to the Investment Advisory Agreement between the Fund and the

Defendant, the Defendant provides investment advisory services and other services to the Fund,

for which the Defendant receives an investment advisory fee equal to 64 basis points, or 0.64%,

of the net assets of the Fund.[1]

7.      Defendant's affiliate, Janus Services, LLC, also receives a separate administrative

services fee of 5 basis points, or 0.05%, of the Fund's net assets, for providing administrative

services to the Fund.  Janus Services, LLC also receives a separate transfer agency fee ranging

from 16 to 21 basis points, depending upon the type of account.

8.      Defendant has delegated the management of the Fund to a sub-advisor, Perkins,

Wolf, McDonnell and Company, LLC ("Perkins" or the "Sub-adviser")[2] pursuant to a Sub-

Advisory Agreement.  The Sub-Advisory Agreement obligates Perkins to provide a wide array of

services to the Fund and the Defendant, including sole responsibility for managing the

investment operations of the Portfolio, causing its offices to attend meetings and furnish written

or oral reports to the Fund Trustees and to the Defendant regarding the management of the

Fund's portfolio, maintaining all necessary books and records, submitting necessary reports and

information to calculate the Fund's net asset value, and providing the Defendant with

information necessary for the Fund's regulatory reporting.

---

[1] Effective February 1, 2006, the Fund has implemented a performance fee adjustment component to its investment
advisory fee.  Accordingly, the advisory fee rate of 64 basis points will be adjusted up or down a maximum of 15
basis points (positive or negative) based upon the Fund's performance relative to its benchmark index, the Russell
MidCap Value Index.  This change will not begin to impact the Fund's advisory fee until February 1, 2007.
[2] Defendant owns a 30% interest in Perkins.

9.      For its services to the Fund, Perkins receives one-half of the investment advisory fee, or, 0.32% of the Funds' net asset value (calculated prior to the effect of any applicable performance fee).[3] The other half of the investment advisory fee is retained by the Defendant.

10.     During the fiscal year ended October 31, 2006, the total investment advisory fee paid by the Fund was $36,150,000, of which Perkins received $18,075,000 and Defendant also received $18,075,000.

11.     During the fiscal year ended October 31, 2005, the total investment advisory fee paid by the Fund was $27,930,032, of which Perkins received $13,965,016 and Defendant also received $13,965,016.

12.     All of the pure investment advisory services rendered to the Fund, including but not limited to stock selection and research functions, are rendered to the Fund by Perkins. While Defendant oversees Perkins in its rendering of these services to the Fund, Defendant does not itself provide any pure investment advisory services directly to the Fund.

13.     The pure investment advisory services Defendant (through Perkins) provides to the Fund are identical to the investment advisory services Defendant provides to other clients, such as institutional and sub-advisory clients, and entail identical costs.  In fact, the cost of advisors, analysts, research data, the physical plant, and other aspects of Defendants' investment advisory services are shared between the mutual funds and the other clients.

14.     Despite the equivalence of the investment advisory services Defendant provides to the Fund and the other clients, the fees Defendant receives from the Fund that are attributable to pure investment advisory services are much higher than the fees Defendant or its affiliates receive from other clients for the identical services.

---

[3] Perkins will share in one-half of any performance fee adjustment to the investment advisory fee as described in note 2.

## Section 36(b) of the Investment Company Act of 1940

15.     In 1940, Congress enacted the Investment Company Act of 1940, 15 U.S.C. §
80a-l et seq. (the "ICA "). The ICA was designed to regulate and curb abuses in the mutual fund
industry and to create standards of care applicable to investment advisors such as Defendant. In
the 1960s, it became clear to Congress that investment advisors to equity mutual funds were
gouging those funds with excessive fees, particularly by not taking economies of scale into
account. As a result, § 36(b), 15 U.S.C., § 80a-35(b), was added to the ICA in 1970, which
created a federal cause of action for breach of fiduciary duty.

16.     Section 36(b) provides in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to
> have a fiduciary duty with respect to the receipt of compensation for services, or
> of payments of a material nature, paid by such registered investment company, or
> by the security holders thereof, to such investment adviser or any affiliated person
> of such investment adviser. An action may be brought under this subsection by
> the Commission, or by a security holder of such registered investment company
> on behalf of such company, against such investment advisers, or an affiliated
> person of such investment advisor, or any other person enumerated in subsection
> (a) of this section who has a fiduciary duty concerning such compensation or
> payments, for breach of fiduciary duty in respect to such compensation or
> payments paid by such registered investment company or by the security holders
> thereof to such investment adviser or person. . . .

17.     In the past several years, the assets managed by Defendant in the Fund have
grown dramatically, as have the fees paid by the Fund. In 2000, the Fund had average net assets
of $26 million and fund shareholders paid $191,000 in advisory fees. By October 31, 2006, the
Fund had exploded in size to $6.25 billion in average net assets, twenty-four times the average
net assets in 2000. As a result of this explosive growth in assets, advisory fees for the fiscal year
ended October 31, 2006 totaled more than $36 million.

18.     In 2000, the Fund paid an investment advisory fee equivalent to 65 basis points,
or 0.65%, of net assets (with no breakpoints). In spite of the explosive growth in assets of the

fund between 2000 and October 31, 2006 (from $26 million to $6.25 billion as alleged in ¶ 17 above), the Fund's advisory fee rate for 2006 is 64 basis points, or 0.64%, of the Fund's net assets.

19.     The reduction in the Fund's advisory fee from 65 basis points to 64 basis points, which took effect on July 1, 2004, occurred as a result of a settlement entered into by the Defendant with the New York Attorney General which required the Defendant to lower its advisory fees, and did not occur at the request of the Board of Directors of the Fund or at the behest of the Defendant.

20.     Defendant realizes large economies of scale in managing the Fund, but has not shared these economies of scale in any meaningful way with the Fund shareholders.  In fact, the investment advisory fee schedule applicable to the Fund does not even contain breakpoints.

21.     While the assets of the Fund and the Fund Complex and the fees have grown dramatically in size, the nature of the services rendered by Defendant has changed little, if at all. Indeed, advances in computing and communication technologies in the past twenty years have resulted in exponential efficiencies that have dramatically reduced the costs of servicing mutual funds in ways Congress could not have imagined when it enacted ICA § 36(b).  Nonetheless, the advisory fees paid to Defendant have grown dramatically.  As a result, the advisory fees paid to Defendant (and accepted by them in violation of their statutory fiduciary duties) are disproportionately large in relationship to the services rendered to Plaintiff.

22.     In addition, Defendant, in violation of its fiduciary duties to Plaintiff, has retained excess profits resulting from economies of scale. These economies of scale are a product of the dramatic growth in assets managed by Defendant.  As assets under management increase, the cost of providing services to the assets does not increase at the same rate.  In fact, with very large

funds, such as the funds at issue here, the cost of servicing additional assets approaches zero, resulting in tremendous economies of scale. Accordingly, any fees received in connection with the additional assets represent almost pure profit. The excess profits resulting from these economies of scale belong to Plaintiff and the other shareholders of the Funds.

      23.    The fees paid to Defendant are technically approved by the Funds' board of directors.[4] A majority of the Funds' board is comprised of statutorily presumed "disinterested" directors as that term is defined in § 10 of the ICA. Regardless of whether these presumably "disinterested" directors meet the requirements of § 10 of the ICA, there is a lack of conscientiousness by the directors in reviewing the advisory fees paid by each of the Funds. In addition, even if statutorily disinterested, the directors are in all practical respects dominated and unduly influenced by Defendant in reviewing the fees paid by Plaintiff and other shareholders of the Fund. In particular, Defendant does not provide the directors with sufficient information for the directors to fulfill their obligations, a factor supporting a finding that Defendant has breached its fiduciary duties.

      24.    Although the fees challenged in this lawsuit may appear at first impression to be very small on a shareholder-by-shareholder basis, they cause a dramatic decrease in Plaintiff's investment returns over time. Arthur Levitt, past Chairman of the Securities and Exchange Commission ("SEC"), was critical of what he called the "tyranny of compounding high costs":

> Instinct tells me that many investors would be shocked to know how seemingly small fees can over time, create such drastic erosion in returns. ... In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

---

[4] While the Fund at issue here is technically governed by a board of trustees rather than directors, the term "directors" is used throughout the complaint and should be read as synonymous with "trustees," as it is under the ICA. *See* 15 U.S.C., § 80a-2(a)(12).

Arthur Levitt, Jr., Inaugural address:  Costs Paid with Other People's Money, Address at Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L. 261, 267 (2001).

### Nature of Claims

25.      In this action, Plaintiff seeks to rescind the investment advisory agreements and to recover for the Fund the total fees charged by Defendant or, alternatively, to recover for the Fund the excess profits resulting from economies of scale wrongfully retained by Defendant and to recover for the Fund other excessive compensation received by, or improper payments wrongfully retained by, Defendant in breach of their fiduciary duty under the ICA § 36(b), 15 U.S.C. § 80a-35(b).  Because the conduct complained of herein is continuing in nature, Plaintiff seeks recovery for a period commencing at the earliest date in light of any applicable statute of limitations through the date of final judgment after trial.

26.      No pre-suit demand on the board of directors of the Fund is required, as the requirements of F.R.C.P. 23.1 do not apply to actions under § 36(b) of the ICA.  *Daily Income Fund v. Fox,* 464 U.S. 523 (1984).

### III.  PARTIES

27.      Plaintiff Rudolph E. Sable is a resident of Palm Harbor, Florida.  He has been a shareholder at all relevant times of the Janus Mid Cap Value Fund.

28.      The Janus Mid Cap Value Fund is a separate series of the Janus Investment Fund, a Massachusetts business trust registered under the Investment Company Act of 1940 as an open-end, management investment company.

29.      Defendant Janus Capital Management LLC ("Janus Capital") is a Delaware corporation and is registered as an investment adviser under the Investment Advisers Act of 1940.  Janus Capital is the investment adviser to each of the Funds.  Janus Capital also acts as a

sub-advisor for a number of private label mutual funds and provides account advisory services for institutional accounts.

## IV.  GENERAL ALLEGATIONS

30.     The test for determining whether compensation paid to Defendant violates § 36(b) is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir. 1982).

31.     Although the Tenth Circuit has not adopted the standard set forth in *Gartenberg*, the Second Circuit's opinion in the *Gartenberg* case regarding application of the test set forth in ¶30 above may offer guidance which is helpful in analyzing whether a fee is excessive pursuant to § 36(b).   All pertinent facts must be weighed in determining whether a fee or other compensation violates § 36(b).   The *Gartenberg* court specifically identified six factors (a portion of "all pertinent facts") to be considered in determining whether a fee is excessive. These factors include: (1) the nature and quality of the services rendered; (2) the profitability of the funds to the advisor/manager; (3) economies of scale; (4) comparative fee structures; (5) fallout benefits (i.e. indirect profits to the advisor/manager resulting from the existence of the funds; and (6) the care and conscientiousness of the directors.  A review of these factors, and the facts in this case, demonstrates that the fees charged by Defendant to the Fund violate § 36(b).

### *(1) The Nature and Quality of the Services Provided to the Fund*

32.     The nature of the investment advisory services provided to the Fund is straightforward:  Defendant (through Perkins) buys and sells, at their discretion, stocks, bonds, and other securities for the Fund.  This is precisely the same service provided to Defendant's institutional and other clients (albeit at a dramatically lower cost).  The materials provided by

8

Defendant to the directors of the Fund establish that the nature of these services has remained unchanged despite dramatic growth in the assets of the Fund and advisory revenues.

33.     The fact that the Defendant is able to subcontract with Perkins, and that Perkins has agreed to render these investment advisory services for an amount equal to one-half of the investment advisory fee payable to the Defendant from the Fund (or 32 basis points before giving effect to any performance fee adjustment), is proof that the investment advisory services provided to the Fund can be purchased for substantially less than the 64 basis point advisory fee charged to the Fund by the Defendant.

34.     Despite the fact that the Fund receives identical investment advisory services as Defendants' institutional and other clients, Plaintiff pays Defendant dramatically higher fees because these fees are not negotiated at arm's length as they are with the other clients.  This disparity in fees evinces Defendant's willingness and determination to prefer their own financial interests to the interests of the Fund and its shareholders.

*(2) The Profitability of the Fund to the Adviser/Manager*

35.     "[T]he 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its adviser be equivalent to 'the product of arm's-length bargaining.'" *See* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp L. 610, 661 (2001) (the "Freeman & Brown Study") (citing *Gartenberg*) [Ex. 1].  The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services.  Defendant's reporting of its revenues and costs to the board of directors of the Fund is intended to, and does, obfuscate Defendant's true profitability by utilizing arbitrary and unreasonable cost allocations.

36.    Defendant's true profitability can be determined on either an incremental basis or a full-cost basis.  Defendant's incremental costs of providing advisory services to Plaintiff are nominal while the additional fees received by Defendant are hugely disproportionate given that the nature, quality, and level of the services remain the same.  Moreover, the one-half portion of the advisory fee retained by Defendant after payment of the sub-advisory fee to Perkins for rendering the investment advisory services to the Fund greatly exceeds the costs to Defendant of supervising Perkins and the other costs of providing advisory services to the Fund.  A review of Defendant's full costs of providing advisory services to the Fund will also demonstrate the enormous profitability to Defendant of managing the Fund.

*(3) Economies of Scale*

37.    The existence of economies of scale in the mutual fund industry has been recently confirmed by both the SEC and the Governmental Accounting Office (the "GAO").  Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of advisory services.  *See* SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31 [Ex. 2]; GAO, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9 [Ex. 3].

38.    In addition, the most significant academic research undertaken since the Wharton School study in the 1960s establishes the existence of economies of scale that are not being passed along to mutual fund shareholders in violation of Defendant's duty to do so under § 36(b).  *See* Freeman & Brown Study" [Ex. 1].  As the Freeman & Brown Study noted:  "The existence of economies of scale has been admitted in SEC filings made by fund managers and is

implicit in the industry's frequent use of fee rates that decrease as assets under management increase.   Fund industry investment managers are prone to cite economies of scale as justification for business combinations." Id. at 620 [Ex. 1].

39.   These economies of scale exist not only fund by fund but also exist with respect to an entire fund complex and even with respect to an investment advisor's entire scope of operations, including services provided to institutional and other clients.  *See* Freeman & Brown Study at 621 n.62 (quoting Victoria E. Schonfeld & Thomas M.J. Kerwin, Organization of a Mutual Fund, 49 Bus. Law 107 (1993)) [Ex. 1].

40.   The clearest example of economies of scale occurs when total assets under management increase due purely to market forces (without the institution of new advisory relationships or new asset gathering).   In such instances, as the GAO confirms, it is possible for the advisor to service the additional assets with zero additional costs.   See GAO Report at 9 (noting that growth from portfolio appreciation is unaccompanied by costs) [Ex. 3].   In other words, an investment advisor can advise a fund that doubles in size purely because of market forces with no increased costs because the services are unchanged.  *See* GAO Report at 9 [Ex. 3]; Freeman & Brown Study at 619 n.43, 621 (noting that investment advisors have benefited by garnering "increased fees from the general increase in market prices with no commensurate efforts on their part" and also noting that as much as 64% of mutual fund asset growth has come from appreciation of portfolio securities, which, unlike growth from share sales to new investors, is costless) [Ex. 1].

41.   Further evidence of Defendant's refusal to pass along economies of scale to Plaintiff and the other shareholders of the Fund is the absence of fee breakpoint levels in the advisory fees for the Fund.   For the majority of Janus' equity funds, including the Mid Cap

Value Fund at issue in this case, Janus Capital receives an advisory fee equal to 64 basis points (.64%) of all the assets of each fund regardless of size. Many of Janus' funds contain billions of dollars in assets. By way of contrast, when Janus Capital acts as the advisor or sub-advisor to mutual funds controlled by third parties, it offers breakpoints at assets beginning as low as, or lower than, $100 million.

42.     The economies of scale enjoyed by Defendant with respect to the Fund have not been shared with Plaintiff as required by § 36(b). As a result, the fees paid to Defendant for advisory services provided to the Fund are excessive and violate § 36(b).

### (4) Comparative Fee Structures

43.     The fees advisors receive from mutual funds for investment advisory services are directly comparable to, though much higher than, the fees advisors receive from other clients for the identical services. As the Freeman & Brown Study noted: "None of the leading advisory fee cases involved equity funds, and hence, none of the courts were confronted directly with the strong analogies that can be drawn between equity advisory services in the fund industry as compared to the pension field where prices are notably lower." Freeman & Brown Study at 653 [Ex. 1]. While a "manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio, . . . the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds. The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower." Freeman & Brown Study at 627-28 [Ex. 1]. Indeed, "a mutual fund, as an entity, actually is an institutional investor. When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on 'institutional status,' it turns on self-dealing and conflict of interest." Freeman &

Brown Study at 629 n.93 [Ex. 1].  Accordingly, the "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds."  Freeman & Brown Study at 671-72 [Ex. 1].

44.     More recently, New York's Attorney General surveyed two fund complexes and confirmed the existence of massive over-charging of fund advisory fees.  Specifically, Mr. Spitzer testified before a Senate Subcommittee on January 27, 2004, as follows:

> Putnam's mutual fund investors were charged 40 percent more for advisory services than Putnam's institutional investors.  In dollar terms, what this fee disparity means is that in 2002 Putnam mutual fund investors paid $290 million more in advisory fees than they would have paid had they been charged the rate given to Putnam's institutional clients, and these are for identical services.

> There was a similar disparity in the advisory fees charged by Alliance. Once again, mutual fund investors were charged significantly higher advisory fees than institutional investors. Specifically, Alliance's mutual fund investors paid advisory fees that were twice those paid by institutional investors.  In dollar terms, this means that Alliance investors paid more than $200 million more in advisory fees than they would have paid had they been charged the rate given to Alliance's institutional clients.

45.     The shareholders of the Janus Mid Cap Value Fund are plagued by the same discriminatory over-charging.  Comparative fee structures clearly establish that Defendant is charging advisory fees to the Fund that are disproportionate to the value of the services rendered. For example:

a.     The fact that only 32 basis points (.32%), or *one-half*, of the investment advisory fee paid by the Mid Cap Value Fund is paid to Perkins, the fund's sub-adviser, when it is Perkins rather than Defendant Janus Capital that actually provides the investment advisory services to the Fund, indicates that the remaining 32 basis points of the advisory fee retained by Janus Capital, ***in addition to the administrative services fee and the transfer agency fee also paid by the Fund to Janus Capital***, represents an

excessive advisory fee. The cost to Janus Capital of supervising Perkins and providing any additional investment advisory services to the Fund is far less than 32 basis points.

b.     Janus Capital provides investment advisory services to sub-advisory and institutional clients which are substantially similar if not identical to those provided to the Fund, and yet the fees charged by Janus Capital for those services (i) are substantially less than 64 basis points, and (ii) contain breakpoints designed to pass on the economies of scale realized in managing those assets to the clients.

### *(5) Fallout Benefits*

46.     Defendant indirectly profits because of the existence of the Fund through fallout benefits. Obvious, but difficult to quantify fallout benefits include the attraction of new customers, cross selling related funds to current customers, and other benefits associated generally with the development of goodwill and the growth in assets of the Fund.

47.     Other benefits include "soft dollars" payable from broker-dealers. Essentially, "soft dollars" are credits furnished to Defendant from broker-dealers and other securities-industry firms in exchange for routing the Fund's securities transaction orders and other business to paying firms. These soft-dollar arrangements benefit Defendant and result in increased costs to the shareholders of the Fund with little to no corresponding benefits to the shareholders of the Fund.

48.     A highly profitable fallout benefit to Defendant is the ability to sell investment advisory services paid for by the Fund at virtually no additional cost. Much like computer software, once the investment research and resulting recommendations are paid for, that research and those recommendations may be sold to other clients at virtually no cost whatsoever to Defendant. Without payment by Plaintiff and other shareholders of the Fund of millions of

dollars in advisory fees, Defendant would have to pay to conduct that research independently in order to provide investment advisory services to other clients, including institutional clients. This is a natural byproduct of the extraordinary economies of scale inherent in the investment advisory business. However, although Plaintiff and other shareholders of the Fund pay all of the costs associated with the investment advisory services, Defendant resells these services to third parties without compensating Plaintiff through reduced fees or in any other way.

49.     Defendant does not provide sufficient information regarding the existence and extent of these and other fallout benefits to the shareholders of the Fund or to the Fund's directors to enable the directors to quantify or even meaningfully consider the benefits. Plaintiff and other shareholders of the Fund have paid for these benefits and are entitled to compensation in the form of reduced advisory fees.

### (6) The Independence and Conscientiousness of the Directors

50.     At least 40% of the Fund's directors must be "disinterested" as defined in § 10 of the ICA. As the GAO Report noted, the structure of most mutual funds embodies a potential conflict of interest between the fund's shareholders and its adviser. This conflict arises because the fees paid by the shareholders represent revenue to the adviser. The United States Supreme Court has stated that the disinterested-director requirement is "the cornerstone of the ICA's efforts to control" this conflict of interest. *Burks v. Lasker*, 441 U.S. 471 (1979).

51.     The disinterested directors are supposed to serve as "watchdogs" for the shareholders of the Fund. As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all contracts and agreements with Defendant and reviewing the reasonableness of the advisory fees received by Defendant. Accordingly, as noted by the GAO, the directors are expected to review, among other things, the

advisor's costs, whether fees have been reduced when the Fund's assets have grown, and the fees charged for similar services.  See GAO Report at 14 [Ex. 3].  These responsibilities are intensive, requiring the directors to rely on information provided by Defendant.  Defendant, in turn, has a fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations.  *See* 15 U.S.C., § 80a-15(c).

52.    The ICA contains a presumption that the disinterested directors are in fact disinterested.   However, the lack of conscientiousness of even disinterested directors in reviewing the fees paid by the Fund, the lack of adequate information provided to the directors in connection with their approvals of the advisory agreements, and the control of management over the directors in reviewing the fees paid by the Fund are not presumed but, rather, are important factors recognized in the *Gartenberg* line of cases in determining whether Defendant has breached their fiduciary duties.   In addition, the SEC has specifically recognized that even disinterested directors may not be independent but, rather, may be subject to domination or undue influence by a fund's investment adviser.

53.    As part of their scheme to receive excessive fees, Defendant did not keep the directors fully informed regarding all material facts and aspects of their fees and other compensation, and the directors failed to insist upon adequate information.  For example:

a.    Defendant provided inadequate information to the directors regarding the advisory fees charged to pension and other institutional clients or to other mutual funds being advised or sub-advised by Defendant and how those fees compare to the fees charged to the Fund.

b.    Defendant provided inadequate information to the directors regarding the economies of scale enjoyed or fallout benefits received by Defendant.

c.      The profitability data given to the board of directors was prepared utilizing arbitrary and unreasonable cost allocation methodologies, and provided no explanation as to how the board should evaluate economies of scale.

54.      The foregoing assures that the directors do not understand Defendant's true cost structure and, in particular, the economies of scale enjoyed by Defendant in providing investment advisory services to the Fund and its institutional and other clients.

## COUNT I
## ICA §36(B)
## BREACH OF FIDUCIARY DUTY

55.      Plaintiff repeats and re-alleges each allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

56.      The fees charged by Defendant for providing advisory services to the Fund are and continue to be excessive and are not within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances, including the advisory fees that Defendant charges its other clients.

57.      In charging and receiving excessive or inappropriate compensation, and in failing to put the interests of Plaintiff and the other shareholders of the Fund ahead of its own interests, Defendant has breached and continues to breach its statutory fiduciary duty to Plaintiff in violation of ICA § 36(b).

58.      Defendant has received and continues to receive excess profits attributable to extraordinary economies of scale.

59.      By retaining excess profits derived from economies of scale, Defendant has breached and continue to breach its statutory fiduciary duty to Plaintiff in violation of ICA § 36(b).

60.    Plaintiff seeks, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendant, up to and including, "the amount of compensation or payments received from" the Fund.

WHEREFORE, Plaintiff demands judgment as follows:

a.    An order declaring that Defendant has violated and continue to violate § 36(b) of the ICA and that any advisory agreements entered into are void ab initio;

b.    An order preliminarily and permanently enjoining Defendant from further violations of the ICA;

c.    An order awarding damages against Defendant including all fees paid to them by Plaintiff and the Fund for all periods not precluded by any applicable statutes of limitation through the trial of this case, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law; and

d.    Such other and further relief as may be proper and just.

Dated:  January 22, 2007.

By: s/ John F. Walsh
s/ Jennifer H. Hunt

John F. Walsh
Jennifer H. Hunt
HILL AND ROBBINS, P.C.
1441 18th Street
100 Blake Street Building
Denver, Colorado  80202
Ph:  (303) 296-8100
Fx:  (303) 296-2388
E-mail: johnwalsh@hillandrobbins.com;
jhunt@hillandrobbins.com

s/ Guy M. Burns
s/ Jonathan S. Coleman
s/ Becky Ferrell-Anton

Guy M. Burns
Jonathan S. Coleman
Becky Ferrell-Anton
JOHNSON, POPE, BOKOR
RUPPEL & BURNS, LLP
403 East Madison Street, Suite 400
Tampa, Florida  33602
Ph:  (813) 225-2500
Fx:  (813) 223-7118
E-mail: guyb@jpfirm.com; jonathanc@jpfirm.com;
beckyf@jpfirm.com

s/ Michael J. Brickman
s/ James C. Bradley
s/ Nina H. Fields

Michael J. Brickman
James C. Bradley
Nina H. Fields
RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN, LLC
174 East Bay Street
Charleston, South Carolina  29401
Ph:  (843) 727-6500
Fx:  (843) 727-3103
E-mail: mbrickman@rpwb.com;
jbradley@rpwb.com; nfields@rpwb.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Complaint has been furnished by regular U.S. mail this 22nd day of January 2007, to the following counsel for the Defendant:

James S. Dittmar
Christopher Moore
GOODWIN PROCTOR, LLP
Exchange Place
53 State Street, #20
Boston, MA 02109

Tucker K. Trautman
DORSEY & WHITNEY LLP
370 17th Street, Suite 4700
Denver, CO  80202


By: s/ Jennifer H. Hunt
John Walsh
Jennifer Hunt
HILL AND ROBBINS, P.C.
1441 18th Street
100 Blake Street Building
Denver, CO  80202
Ph:  (303) 296-8100
Fx:  (303) 296-2388

Guy M. Burns
Jonathan S. Coleman
Becky Ferrell-Anton
JOHNSON, POPE, BOKOR,
RUPPEL & BURNS, L.L.P.
403 East Madison Street, Suite 400
Tampa, FL  33602
Ph:  (813) 225-2500
Fx:  (813) 223-7118

Michael J. Brickman
James C. Bradley
Nina Fields
RICHARDSON PATRICK WESTBROOK
& BRICKMAN, LLC
P.O. Box 879
Charleston, SC  29402
Ph:  (843) 727-6500
Fx:  (843) 727-3103

*Attorneys for Plaintiff*

107886